IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JO TRESLLEY,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | 22-cv-494-wmc |

THE GUARDIAN LIFE INSURANCE
COMPANY OF AMERICA,

Defendant.

Plaintiff Jo Treslley is suing defendant The Guardian Life Insurance Company of America ("Guardian") under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a) ("ERISA"), after being denied long-term benefits through her employer's disability insurance plan. Treslley claims the denials were arbitrary and capricious, while Guardian counters they were appropriate based on a review of her medical records. For the reasons that follow, the undisputed facts and controlling case law require this court defer to Guardian's judgment.

UNDISPUTED FACTS[1]

A. Background

Treslley, who was 60 years old at the time she filed her claim for long-term disability, had worked as the Director of Financial Operations at Community Living Alliance ("Alliance") for about 18 years. (Dkt. #12, at 43.) According to the job description, the

---

[1] The following facts are material and undisputed for purposes of summary judgment. The facts are drawn from the administrative record compiled by Guardian in considering Treslley's claim. *See Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 761 (7th Cir. 2010).

Director of Financial Operations is responsible for providing financial direction to Alliance by developing a budget and strategic plan, as well as leading major business operations. The director is also responsible for assuring Alliance's financial viability, providing financial reports to the leadership team, developing and renewing leases, and tax planning.  The director is also responsible for working with contracting agencies, legal counsel and auditors, plus overseeing finance teams.  The position required either a bachelor's degree and 8 years of experience managing a budget of at least $20 million or an "associated degree" with 12 years of experience managing a budget of at least $20 million.  The job is stressful and requires continuous sitting and using a keyboard but is otherwise "physically comfortable."  (Dkt. #12, at 44, 47.)

Defendant Guardian is an insurance company authorized to conduct business in Wisconsin.  In January 2019, Guardian issued a group long term disability insurance policy to Alliance for the benefit of its employees.  (Dkt. #12-45, at 39.)  Under the policy, Guardian retained the "discretionary authority" to determine an employee's eligibility and interpret the terms of the policy.  (*Id.* at 11.)  Guardian is also responsible for paying any long-term disability benefits approved under the policy.

Among other things, the policy provided for an "elimination period," meaning that benefits would not begin until after a claimant had been continuously disabled for a consecutive period of 90 days.  (*Id.* at 74, 86.)  For example, a claimant was considered disabled under the plan if for a consecutive, 90-day period, "Sickness or Injury cause[d] impairment to such a degree" that claimant was "[n]ot able to perform, on a Full-Time basis, the major duties of [her] Own Occupation during the Elimination Period and the

2

Own Occupation period."  (*Id.* at 72, 86.)  Guardian defined "Own Occupation" as "any employment, trade, or profession that is substantially similar in terms of tasks, functions, skills, abilities, knowledge, training and experience, required by Employers from those engaged in a particular occupation in the general labor market in the national economy." (*Id.* at 81.)  However, a person's own occupation is "not defined with reference to a specific Employer or specific location or particular work environment."  (*Id.* at 82.)

### B.  Plaintiff's Diabetes and Treatment

Treslley was first diagnosed with type 1 diabetes in 1983.  In March 2021, Treslley's endocrinologist, Dr. Kristen Stevenson, noted that her diabetes was generally well-controlled, and her glycemic control had significantly improved over recent months, but that Treslley still experienced occasional periods of hyperglycemia (high blood sugar) midday.  (Dkt. #12-10, at 32.)  Dr. Stevenson also noted that Treslley's A1C[2] had been historically elevated, but with a "dramatic improvement" as of November 2020.  (*Id.*)  She added that Treslley was stressed at work and questioned how that stress may be impacting her health and diabetes control.  (*Id.*)  In June 2021, Dr. Stevenson again noted that Treslley's diabetes was well controlled, with intermittent hyperglycemia.  (Dkt. #12-15, at 4.)  Then, in April 2022, Stevenson similarly noted that Treslley's blood sugars were generally stable.  (Dkt. #12-39, at 19.)

---

[2] An A1C test measures a person's average blood sugar level over two to three months.  *A1C Test*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643.

### C. Plaintiff's Cognitive Issues

Treslley experienced significant stress and grief when (1) her husband died of cancer in 2019, and (2) her sister died from diabetes-related complications in 2020.  In early 2021, Treslley reported that she could not focus and was making mistakes at work.    In June of 2021, she further reported needing an "excessive" amount of time to complete her job duties because of vision problems, headaches and diminished concentration.  Later that month, Dr. Peggy Simpson, an internist, wrote that Treslley had an attention and concentration deficit and memory change, noting that it was likely stress related from "grief/health/etc." and that it was "ok" for Treslley to take some time off.  (Dkt. #12-3, at 24.)

Dr. Margaret Punt, who was also an internist, noted again in October 2021 that Treslley had "clearly had a sudden decline in cognitive abilities," writing that she had worked in a high functioning position and was suddenly unable to perform tasks that she had been doing for 30 years.  (Dkt. #12-29, at 30.)  Treslley also reported difficulties managing her blood sugar, as she could not "remember basic principles of what to take when low."  (*Id.* at 30-31.)  At that time, Dr. Punt noted there could be an underlying neurological issue, but she did not have enough evidence or data to fill out disability paperwork.  (*Id.*)  Accordingly, she referred Treslley to neurology.  (*Id.*)  Relatedly, Dr. Stevenson's own call notes from October stated there was nothing about Treslley's well-controlled diabetes that would affect her cognition.  (Dkt. #12-30, at 17.)

In November 2021, Treslley underwent a neuropsychological evaluation by Dr. Gretchen Batterman, during which she reported difficulty concentrating, forgetfulness,

slowed processing, confusion, difficulty multitasking, and brain fog.  As for the evaluation itself, Dr. Batterman specifically noted that Treslley gave a "good effort," such that the results appeared to be a valid estimate of her functionality.  Ultimately, Dr. Batterman concluded that Treslley's "expected level of premorbid functioning" was in the average range, and her overall intellectual functioning was in the average range at the time of the test.  (Dkt. #12-8, at 36.)

As to her relevant sub scores, Treslley scored in the "borderline range" for new-learning/encoding, subsequent recall/memory of auditory-verbal information, and delayed recall of words.  She scored in the low average range for:  attention-concentration tasks, ranging from simple to complex/divided and ability to hold information in mind for cognitive manipulation.  On the other hand, Treslley scored in the average range (e.g., "cognitive speed/efficiency of information processing and cognitive flexibility") and high average range (e.g., verbal reasoning and conceptualization) in several subcategories.  (*Id.* at 37.)  Finally, Dr. Batterman noted that Treslley's self-reported questionnaires showed "significant emotional disturbances in somatic distress, obsessive worry, depression, and thought organization," and opined that her emotional distress may be negatively affecting her cognition.  (*Id.*)

Dr. Batterman summarized her findings as follows: "Cognitive Complaints with Normal Neuropsychological Exam-rule out cognitive change.  Anxiety and Depression." (*Id.*)  Batterman added that Treslley's overall level of functional ability for day-to-day tasks was average, and she wrote that Treslley's "cognitive profile indicate[d] no deficits, with Borderline Verbal Memory."  (*Id.*)  Batterman further wrote, "when examining the non-

obvious verbal memory tasks, that is, tasks that require memory performance to do the task, but are not identified as obvious memory tasks, her performance showed a score in the Average range; these tasks assess more 'functional' memory ability." (*Id.*)

However, Dr. Batterman also wrote that Treslley's efficiency at learning new information was "impaired," and once she learned the information, her ability to recall that information was also impaired, which suggested "significant forgetting and poor efficiency of learning new information." (*Id.* at 37-38.) Under "medication/therapy," therefore, Batterman recommended that Treslley continue to follow-up with her primary care physician to ensure ongoing medical wellness and medication evaluations. (*Id.* at 38.) She further recommended techniques for reducing memory mistakes, exercise, a healthy diet, and social activities. (*Id.*) In December, Treslley also self-referred for a behavioral health consultation with a social worker, who diagnosed her with adjustment disorder related to bereavement.[3]

In March 2022, Treslley presented to Dr. Asher Jones, a neurologist, for evaluation of cognitive decline that probably began in 2020 with the death of her husband and sister. (Dkt. #12-38, at 4.) Dr. Jones wrote that the likelihood of Treslley having a neurodegenerative condition was low, because her November 2021 MRI was "essentially unremarkable" and her reported cognitive decline was likely "mood related." (*Id.*) Jones

---

[3] "Adjustment disorders are excessive reactions to stress that involve negative thoughts, strong emotions and changes in behavior." *Adjustment Disorders*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/adjustment-disorders/symptoms-causes/syc-20355224.

added that Treslley may have had a higher cognitive baseline than estimated, which could imply an "average" cognitive profile was abnormal for her.  (*Id.*)

### D. Plaintiff's Eye Problems

At Treslley's eye exam in February 2021, Dr. Stevenson noted that the findings were "stable," and her left eye was "without findings of retinopathy."  (Dkt. #12-10, at 32.)  At her June appointment, however, Dr. James Bell, an ophthalmologist, noted that Treslley reported new "floaters," as well as a "cobweb" and red line in her vision.  (Dkt. #12-13, at 24.)  She also reported developing a dull ache in her right eye when she read or looked at a computer screen for 30 minutes or more.  (*Id.*)  Treslley also reported a "preretinal hemorrhage" in her left eye and received an intraocular injection.  (*Id.* at 25-26.)

In October 2021, Dr. Bell called Treslley to discuss her disability insurance claim.  (Dkt. #12-29, at 26.)  According to his notes from that call, Dr. Bell advised Treslley that he had to complete the paperwork "honestly" and wondered what was keeping her from working.  (*Id.*)  She explained that her health problems' combined effects prevented her from working, her vision remained bothersome, and she could no longer work 10 hours per day.  (*Id.*)  If the eye floaters were the main issue, Dr. Bell advised they could consider surgery.  (*Id.*)

In November 2021, Dr. Bell wrote that: Treslley's eyes were looking good overall, noting that her cobweb appeared to be fading; the blood in her left eye had gone away; and there were no concerns about bad blood vessels or about swelling in her retina.  (Dkt. #12-31, at 20-21.)  In March 2022, Dr. Bell also reassured Treslley "that [her eyes] look

really good," and there was no evidence of new bleeding, while noting that "it would be okay to look into cataract surgery if [she] would like."  (Dkt. #12-38, at 25.)

### E.  Plaintiff's Chronic Kidney Disease

Although her bloodwork was stable, Treslley was diagnosed with chronic kidney disease.  (Dkt. #12-15, at 4.)  In July 2021, a kidney ultrasound indicated that Treslley's kidneys looked "ok," although there was a benign cyst and a benign lesion on her kidneys. (Dkt. #12-4, at 38 and Dkt. #12-8, at 30.)

### F.  Plaintiff's Back, Shoulder and Hand Problems

In May 2021, Dr. Ann Metzler, a chiropractor, diagnosed Treslley with low back pain and "segmental and somatic" dysfunction of her lumbar, sacral, thoracic and cervical regions, finding a decreased range of motion and moderately severe pain in her back.  (Dkt. #12-8, at 32.)  She also noted evidence of muscle hypertonicity (too much muscle tone). (*Id.*)  At an appointment later that month, Dr. Metzler again noted muscle hypertonicity and reduced range of motion in her back.

In December, Treslley saw Dr. Metzler for pain in the right side of her neck and right shoulder, and Dr. Metzler found that she had hypertonicity, reduced spinal range of motion, and muscle spasms.  (*Id.* at 32-33.)  Treslley saw Dr. Metzler once more in January 2022, where Dr. Metzler noted some improvement in her condition, but also noted that Treslley continued to exhibit hypertonicity, reduced range of motion and subluxation.  At a January appointment with a nurse practitioner, Treslley also reported shoulder pain with radiating pain and numbness in her right hand.  (Dkt. 12-37, at 36.)  At another January

8

appointment with Dr. Metzler, Treslley specifically complained of left shoulder pain radiating into her fingers, and Dr. Metzler noted that her condition had improved little. (Dkt. #12-8, at 34.)  Treslley then saw a sports medicine specialist for her shoulder pain, and he administered a steroid injection while referring her for physical therapy.   In February 2022, she underwent an electromyography to evaluate her right arm symptoms. That test showed a moderately severe right median mononeuropathy, "slowing of conduction velocity" in her right elbow and "chronic denervation" of her right hand.  (Dkt. #12-37, at 46.)

In March 2022, another doctor treated Treslley for numbness in her hand, recommending surgery.  Later that month, Treslley had right cubital and carpal tunnel release surgery, and at her post-operative appointment, she reported that her symptoms had improved, though she still had numbness in her small finger.  (Dkt. #12-39, at 15.)

### G. Plaintiff's Initial Claim

Treslley's last day of full-time work was June 4, and she filed a claim for long-term disability benefits with Guardian around that same date.  On June 14, Guardian sent Treslley a letter stating that it needed additional information, including an attending physician's statement, to evaluate her claim.  (Dkt. #12, at 81.)

Dr. Simpson completed an attending physician statement in June, noting that Treslley had diabetic retinopathy, as well as concentration and attention deficits.  (Dkt. #12 at 64.)  Simpson had further advised Treslley to reduce her work hours in February 2021 and to stop working in June 2021.  (*Id.* at 65.)  However, Simpson wrote that there was inadequate information to determine the degree of Treslley's psychiatric impairment.

9

(*Id.*)  Ultimately, Simpson stated that Treslley could sit for eight hours per day, stand and walk for one hour per day, alternately sit and stand for two hours a day and bend/stoop on occasion, but would have difficulty lifting things off the floor or getting herself off the floor, and could not drive in the dark due to poor vision.  (*Id.*)  Thus, Dr. Simpson wrote that Treslley had *no* capacity to continue in her "current employment," and that any assessment as to her capacity for work needed further time and evaluation.  (*Id.*)

On July 19, Guardian notified Treslley that it would require a 30-day extension because she had not submitted the necessary information.[4]  (*Id.* at 8-9.)  In August, Dr. Punt, Treslley's internist, sent her a message about her disability paperwork, noting that she was "unclear what physical or mental disability you have [that] is preventing you from working," and that her disability paperwork could not be completed unless there was a specific issue causing her inability to work.  (Dkt. #12-24, at 40.)

A month later, on August 18, 2021, Guardian denied Treslley's claim because her medical information did not "provide objective evidence that preclude[d] [her] ability to work in [her] own occupation throughout the elimination period and beyond."  (Dkt. #12-2, at 8.)  In reviewing Treslley's claim, Guardian considered specifically whether she could perform the major duties of a "Manager, Financial Institution" as defined in the Dictionary of Occupational Titles ("DOT").  According to the DOT, a manager could have the following duties: (1) managing the office of a financial institution; (2) implementing institution policies and procedures; (3) directing subordinates; (4) working with

---

[4] Guardian concedes that it did not seek an extension of time to review Treslley's initial claim or her second appeal, but the administrative record shows that it notified her that it needed an extension on both occasions.

stakeholders to develop business; and (5) preparing financial and regulatory reports. Further, a manager position required a high school degree, prior experience, and a "general learning ability" in the 67th to 89th percentile.  (Dkt. #12, at 99 and Dkt. #12-45, at 108.)

Next, Guardian summarized Dr. Simpson's attending physician statement, noting that her primary diagnosis was diabetic retinopathy, with difficulty lifting items off the floor, getting up off the floor, and an inability to drive in the dark because of poor vision. (Dkt. #12-2, at 9.)   Guardian further concluded that the "medical information submitted to date [did] not support restrictions and/or limitations preventing [her] from performing on a fulltime basis the major duties of [her] own occupation throughout the elimination period and beyond."  (*Id.* at 8-9.)

### H. Plaintiff's First Appeal

On February 2, 2022, Treslley appealed Guardian's "adverse benefit determination," submitting a medical source statement from Dr. Punt in support of her appeal, along with her updated medical records, including her neuropsychological exam. In the medical source statement, Dr. Punt diagnosed her with confusion, adjustment disorder and stress reaction, listing her symptoms as inattention, lack of focus and confusion.  (Dkt. #12-8, at 41.)  Next, Dr. Punt wrote that Treslley's impairments could be expected to last at least twelve months and that emotional factors contributed to the severity of her symptoms and limitations.  (*Id.* at 42.)  Punt added that Treslley would need to take unscheduled breaks at an unknown frequency and of an unknown length during the day due to her headaches and confusion.  (*Id.*)  Punt also wrote that she would

11

likely be off task for 25 percent or more of the day, although she was capable of moderate stress or "normal" work.  (*Id.* at 44.)  Dr. Punt went on to explain that: "it remains unclear what is causing the patient[']s symptoms of inattention and lack of focus and memory issues.  This is still being evaluated and form cannot be fully completed currently."  (*Id.*)  She wrote that Treslley had no physical limitations.  (*Id.* at 42.)

On March 23, 2022, four days past Guardian's decision deadline, it denied Treslley's first appeal.  In reviewing Treslley's appeal, Guardian generated occupation data for "President, Financial Institution" from the DOT.  That position had the following responsibilities:  (1) planning, developing and directing institutional policies; (2) coordinating communication between stakeholders; (3) delegating to subordinate employees; and (4) reviewing reports and financial statements to determine policy changes. The president position required a "general learning ability" above the 89th percentile. (Dkt. #12-27, at 39.)

Next, a nurse case manager reviewed Treslley's claim, noting that she had hypertension, dyslipidemia, obesity, stage three chronic kidney disease, gastroesophageal reflux disease, proliferative diabetic retinopathy, diabetic polyneuropathy and uncontrolled diabetes.  (Dkt. #12-45, at 128.)  The nurse wrote, "all of these conditions may impact the other at times, w/severity of [symptoms] fluctuating."  (*Id.*)

Guardian concluded that the medical evidence failed to show that Treslley could *not* work in her own occupation because:  (1) her diabetic retinopathy was stable with no visual impairments; (2) her glycemic control had improved, and her blood work had been stable for over five years; (3) the June 2021 visit notes stated that issues were likely stress-related;

12

(4) she had good kidney function and normal bloodwork; (5) Dr. Punt's notes from August and October 2021 stated that it was unclear if there was a physical or mental disability preventing work; and (6) her neuropsychological evaluation ruled out any cognitive change and the medical provider stated that her overall functional ability for day-to-day tasks was average. (Dkt. #12-36, at 12.) Guardian also concluded that Treslley had not provided objective evidence that she could not perform the duties of her occupation because: all testing "ha[d] been within normal limits"; and "all providers have stated that there [were] no restrictions or limitations preventing the ability to perform the claimant's own occupation." (*Id.*)

## I.   Plaintiff's Second Appeal

On May 26, 2022, Treslley filed a second appeal. On July 7, 2022, Guardian notified Treslley that it required an additional 45 days to complete its review because more medical information was needed. (Dkt. #12-43, at 30.) Later that month, however, Guardian acknowledged that it had already received the documents that it requested and stated that it would issue a final determination within 30 days. (*Id.* at 33.)

On August 11, 2022, Guardian found that Treslley was not disabled because she was "capable of performing the duties of her own occupation on a full-time basis." (Dkt. #12-43, at 42.) First, as to her diabetes, it noted that her A1C had improved in November 2020, and Dr. Stevenson's October 2021 note stated that her diabetes was well controlled. (*Id.* at 40-41.)

Second, Guardian noted that Treslley saw a chiropractor for back pain and "somatic dysfunction" in her back; acknowledged that she had "reduced motion in cervical, thoracic

and lumbar region[s]"; but concluded that there were "no actual measured range of motion muscle strength deficits provided." (*Id.* at 40.)  Guardian further found that the frequency of treatment did not support the claimed severity of her symptoms, and there were no diagnostic test results confirming any diagnosis or specialist referrals.  (*Id.* at 40-41.) Therefore, Guardian concluded that there were no limitations reported by her physician as to her complaints of low back, neck and shoulder pain.  (*Id.* at 41.)

Third, as to Treslley's diabetic retinopathy and vitreous hemorrhage, Guardian concluded that she had no vision-based limitations because:  (1) as of August 2021, she reported improved vision and less of a cobweb; (2) Dr. Bell completed an attending physician statement stating that Treslley was capable of working;[5] (3) in his notes summarizing a phone call, Dr. Bell wondered what medical reason was still keeping her from working because she reported that her vision was still bothersome to work for 10 hours per day and recommended surgery to remove eye floaters; (4) follow-up visits documented that the blood in her left eye was gone, and there were no concerns about swelling in the retina or bad blood vessels; and (5) Dr. Bell had identified no vision-based limitations.  (*Id.* at 41.)

Fourth, Guardian concluded that Treslley's kidney disease did not prevent her from working because the cyst and lesion on her kidneys were benign, and she had not been examined by a nephrologist.  (*Id.*)

---

[5] The court was unable to find Dr. Bell's attending physician statement in the administrative record, but plaintiff did not dispute Bell's having found her capable of working.

14

Fifth, Guardian concluded that there were no clinical findings supporting limitations based on her complaints of cognitive difficulties. (*Id.*) In particular, Guardian noted the following information received from Treslley's doctors: (1) Dr. Simpson's attending physician statement describing concentration and attention deficits; (2) Dr. Punt's message stating that it was unclear what physical or mental conditions were preventing Treslley from working, and offering no specific causes for her claimed inability to work; (3) Dr. Punt's notes documenting cognitive impairment, confusion, inattention and lack of focus, but with no supporting clinical findings; (4) Dr. Stevenson's note that her diabetes should not impact cognition; (5) Dr. Punt's medical source statement indicating no physical limitations, her adjustment disorder and stress reaction diagnosis and the unknown reason for her cognitive issues; (6) Dr. Batterman's neuropsychological exam indicating no deficits, with borderline verbal memory and her overall average level of functional ability for day-to-day tasks; and (7) Dr. Jones's note that there were no specific deficits and his suspicion that her cognitive decline was mood related. (*Id.* at 41-42.) It added that her lab tests were normal, and her brain MRI was unremarkable. (*Id.*) Guardian concluded that Treslley's average overall functional ability would not prevent her from working full-time in her own occupation. (*Id.* at 42.)

Sixth, Guardian found that at Treslley's carpal tunnel surgery, follow-up appointment, she reported *no* issues with the surgery and that everything was normal. (*Id.* at 42.) Finally, Guardian noted that Treslley's "own treating physicians opined that she is capable of working full-time." (*Id.*)

15

OPINION

ERISA § 502(a)(1)(B) authorizes a participant or beneficiary to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." ERISA § 502(a)(1)(B) (codified at 29 U.S.C. § 1132(a)(1)(B)). Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," even viewing all evidence and drawing all inferences in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). With regard to the denial of benefits in particular, under an insurance policy governed by ERISA the court begins by determining the appropriate standard of review. Generally, a denial of ERISA benefits must be reviewed under a *de novo* standard, unless the plan has given the plan administrator or fiduciary discretionary authority to determine benefits or construe the terms of the plan. *Williams v. Aetna Life Insurance Company*, 509 F.3d 317, 321 (7th Cir. 2007).

Here, the parties agree that the policy grants discretionary authority to defendant Guardian to make all benefits determinations, so the arbitrary and capricious standard of review would apply in this case. *See Holmstrom*, 615 F.3d at 766 *(citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); (Pl.'s Brief (dkt. #14) 10) and Def.'s Brief

(dkt. #17) 6.)[6]  Under the arbitrary and capricious standard, the court "is not to decide whether it would reach the same decision as the administrator"; rather, the administrator's decision will be upheld "as long as specific reasons for the denial are communicated to the claimant and supported by record evidence."  *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009) (citing *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006); *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 831 (7th Cir. 2009)).  Even so, "[r]eview under this deferential standard is not a rubber stamp," and a court will not uphold a plan administrator's decision "when there is an absence of reasoning in the record to support it." *Holmstrom*, 615 F.3d at 766 (quotation marks omitted).[7]

---

[6] Defendant's decision on the first appeal was late.  A recent Seventh Circuit opinion, *Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998 (7th Cir. 2019), concluded that an administrator's decision had to be reviewed *de novo* when it issued its final decision eight days after the extended deadline had passed. *Id.* at 1000.  However, plaintiff failed to argue that her case should be reviewed *de novo* and, therefore, waived that argument.  *See Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived.").  In any event, the facts of this case are distinguishable from *Fessenden* because, as discussed below, defendant timely issued its *final* decision before plaintiff filed this action.  *See Fessenden*, 927 F.3d at 1000-01.

[7] "An administrator's conflict of interest is a key consideration under this deferential standard." *Holmstrom*, 615 F.3d at 766.  Such a conflict exists where an administrator "both determines whether an employee is eligible for benefits *and* pays benefits out of its own pocket."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (emphasis added).  In such a case, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits."  *Id.*; *see also Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861-62 (7th Cir. 2009) ("When the case is borderline . . . the inherent conflict of interest . . . can push it over the edge -- towards a finding of capriciousness.").  While neither party specifically raised this on the applicable standard of review, the defendant bore both the responsibility to determine plaintiff's eligibility for the requested benefits fairly *and* the obligation to pay for any benefits it approved.  Accordingly, the court will consider defendant's conflict of interest as a factor in its "arbitrary and capricious" review.

Before this court, plaintiff argues that defendant's review and denial of her claim was arbitrary and capricious because it: (1) conducted a flawed vocational analysis; (2) improperly disregarded her cognitive symptoms and the compounding effect of her multiple medical conditions; (3) misstated and cherry-picked her medical records; and (4) violated ERISA claim procedures. The court addresses each of these arguments below.

### 1. Vocational Analysis

As an initial matter, plaintiff argues that defendant improperly considered whether she could work as a Manager or President of a financial institution because those positions were less demanding than her Director of Financial Operations position. Specifically, she asserts that the so-called "Manager" position was actually an entry-level position, which only required a high school diploma *and* did not involve developing and renewing leases, preparing budgets, *or* negotiating contracts. Next, she contends that a "President, Financial Institution" would not be responsible for the same level of strategic planning, tax planning, complying with audits or managing payroll that her own position demanded. However, the duties of these two DOT positions and plaintiff's Director of Financial Operations position substantially overlap, including managing a finance team and financial reporting responsibilities.

Plaintiff also fails to explain how any differences made her past position more mentally taxing than the DOT-defined positions used by defendant. *E.g.*, *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 734 (S.D. Ohio 2001) (concluding that DOT defined job was not similar to plaintiff's actual job because it was "considerably more [physically] strenuous"). Further, plaintiff does not assert that she could have completed

the job duties listed in the DOT defined positions, but not the Director position.  For example, plaintiff does not argue that she could have continued working in her director position if, like the DOT defined Manager position, it did *not* require her to hold a college degree or address leases, budgets and contracts.  To the contrary, she asserts that she could not perform the major duties of *any occupation*.[8]  (Pl.'s Brief (dkt. #14) 20-21.)  Accordingly, she has not explained how the differences between DOT descriptions and her director position wrongfully impacted defendant's denial of her claim.

### 2.  Plaintiff's Health Conditions

Plaintiff next asserts that: (a) cognitive symptoms prevented her from working in her own, past occupation; (b) defendant ignored the *combined* effects of her cognitive symptoms and her other conditions; and (c) defendant misstated and omitted key parts of the record.

#### a.  Cognitive Issues

Plaintiff asserts that her cognitive symptoms prevented her from working in her own occupation, and that defendant selectively reviewed neuropsychological assessments in concluding otherwise.  Specifically, she asserts that defendant ignored how her low average attention/concentration, along with her poor ability to learn new concepts would impact her work as a high-level executive.  She adds that defendant unreasonably disregarded her cognitive symptoms because they were unattributed to a *specific* underlying diagnosis.

---

[8]  Plaintiff also asserts that the DOT's "Treasurer, Controller, and Chief Financial Officer" description would have been more accurate, but she does not explain why by comparing the specific duties and responsibilities of all three DOT positions and her own, past position.

The court agrees that evidence of record is mixed as to the extent of plaintiff's cognitive issues, which called for an exercise of judgment in deciding whether her cognitive issues prevented her from working in her own occupation.   However, the court cannot disturb defendant's conclusion that they did not where the evidence might justify either outcome.   *See Semien v. Life Insurance Co. of North America*, 436 F.3d 805, 812 (7th Cir. 2006) (the "arbitrary and capricious standard is the least demanding form of judicial review of administrative action, and *any questions of judgment are left to the administrator of the plan*." (emphasis added and quotation marks omitted)).   Plaintiff points to her cognitive issues that she reported at her June 2021, October 2021, November 2021 and March 2022 doctor's appointments.   For example, in October 2021, plaintiff's internist, Dr. Punt, specifically noted that she had "clearly had a sudden decline in cognitive abilities." Similarly, in March 2022, plaintiff's neurologist, Dr. Jones, noted that her decline was likely mood related, and there was a possibility that her "average," overall cognitive profile presented a decline for her.

However, other evidence suggests that plaintiff did *not* have a cognitive impairment, at least not a permanent one, and any temporary impairment was not as severe as she asserts. In June 2021, plaintiff's internist, Dr. Simpson, noted that there was inadequate information to determine plaintiff's degree of psychiatric impairment.   Dr. Punt also wrote in August 2021 that it was "unclear what physical or mental disability" prevented plaintiff from working, and she could not complete her disability paperwork *unless* there was a specific medical issue causing her inability to work.   Although a specific diagnosis was not required to find that plaintiff was disabled, the court will not fault defendant for relying

on the lack of a diagnosed condition underlying her cognitive issues, as that evidence was relevant to establishing her ability to work in her own occupation.[9]  *See Wintermute v. The Guardian*, 524 F. Supp. 2d 954, 960 (S.D. Ohio 2007) ("no particular diagnosis is required to establish disability, *the medical evidence surrounding a diagnosis may be used in determining a plaintiff's abilities*" (emphasis added)).  Further, in March 2022, Dr. Jones noted that it was unlikely plaintiff had a neurodegenerative condition, and her MRI was "essentially unremarkable."

Even Dr. Batterman's neuropsychological assessment produced mixed results.  On the one hand, Dr. Batterman found that plaintiff had low average attention and concentration, an impaired ability to learn new information, and experienced "significant forgetting."  On the other hand, Batterman wrote that plaintiff's neuropsychological examination was normal, and she had not experienced a cognitive change.  At worst, Batterman assessed plaintiff as having average intellectual functioning, which she opined was the *same* as her "expected level of premorbid functioning."[10]  Batterman further found that plaintiff had average functional memory and no cognitive deficits.  Finally, although defendant did not rely on plaintiff's lack of treatment for her claimed cognitive issues in denying her initial claim for benefits or during her appeals, there is no evidence that any

---

[9] Plaintiff was diagnosed with adjustment disorder and stress reaction, but it is unclear what, if any, effect these conditions had on her cognition.

[10] The court is concerned about defendant's conclusion that plaintiff's average overall functional ability would not prevent her from working in her own occupation because her director position may have required above average functioning.  Nevertheless, as discussed above, the mixed evidence about the degree of her cognitive impairment and her "expected level of premorbid functioning" is not enough to show that defendant's conclusion was arbitrary and capricious.

doctor prescribed her medication for a mood-related cognitive issue, which arguably supports defendant's conclusion that plaintiff was not disabled by any cognitive issues.

Certainly, a plan administrator cannot "cherry-pick" evidence supporting its decision, and defendant did not address all of Dr. Batterman's findings that were contrary to its conclusion. *See Leger*, 557 F.3d at 832-33 (a plan administrator cannot cherry-pick evidence that supports its decision while ignoring contrary evidence). However, defendant acknowledged at least some of the evidence contrary to its conclusion, like Dr. Batterman's borderline verbal memory finding as well as notes from plaintiff's other doctors about her cognitive issues. As to her argument that defendant did not address the effect this impaired memory would have on her ability to work in her high-level position; Dr. Batterman did *not* define "impaired," and the court will not speculate from Batterman's general finding about plaintiff's "impaired" learning to conclude that the impairment would prevent her from learning at the required percentiles listed in the DOT position descriptions. *See Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion" (quotation marks omitted)).

In any event, as discussed above, defendant could have reasonably chosen to credit Dr. Batterman's other findings, like plaintiff's normal neurological exam, in finding her not disabled. Thus, the record evidence supports defendant's conclusion that plaintiff's cognitive issues did not prevent her from working in her own occupation.

### b.  Plaintiff's Other Medical Conditions

Relatedly, plaintiff contends that defendant ignored the interplay between her cognitive issues and her other medical conditions -- diabetes, diabetic retinopathy and vitreous hemorrhage, back and shoulder pain, kidney disease and carpal tunnel syndrome.

Without minimizing the severity of any of plaintiff's other conditions, it takes little discussion to conclude that none of these conditions, either individually or collectively, prevented her from working in her own, past occupation.  First, plaintiff's medical records show that her diabetes was well-controlled and, at least as of November 2020, her A1C had *dramatically improved*.  While plaintiff points to bouts of hyperglycemia midday, she offers no explanation as to how those "bouts" would prevent her from working in her own occupation.  Similarly, although there is *some* evidence that plaintiff's cognitive issues worsened before learning to control her diabetes, Dr. Stevenson noted that her blood sugars were now stable, *and* she had apparently worked in the past with even worse control of her diabetes, indicating that her improved and generally well-controlled diabetes was not preventing her from working.  Second, as to her diabetic retinopathy and preretinal hemorrhage, Dr. Bell noted in November 2021 that:  her eyes looked good overall; the blood in her eye had gone away; and he had no concerns about bad blood vessels or retinal swelling.  Further, Dr. Bell reassured plaintiff that her eyes looked "really good" in March 2022.  Third, as to her shoulder and back injuries, there is *no* evidence that these injuries prevented her from working in *her own occupation*, and Dr. Punt noted in the medical source statement that she had no physical limitations.  Fourth, as to plaintiff's kidney disease: her bloodwork had remained stable; an ultrasound showed that her kidneys looked "ok"; and

23

a CT scan showed that the cyst and lesion on her kidneys turned out to be benign.  Fifth, surgery relieved many of plaintiff's carpal tunnel syndrome symptoms, and by the end, she only reported numbness in her little finger.  Finally, although she contends that that numbness would prevent her from using a keyboard, she offers no evidence supporting that conclusion.

Accordingly, the record evidence shows that many of plaintiff's conditions were stable or improving, and there is no evidence that *any* of the conditions limited her ability to work.  Thus, even considering plaintiff's other medical conditions collectively, and in combination with her claimed cognitive issues, she does not show that she was unable to work in her own occupation.

### c.  Defendant's Alleged Misstatements and Omissions

Finally, plaintiff argues that defendant misstated that: (1) all test results were normal; (2) she had no issues following her 2022 carpal tunnel surgery; (3) she had no specialist referral for her back and shoulder issues; and (4) there was no range of motion test performed on her back.  Plaintiff further argues that defendant should have explained *why* it disagreed with her treating physicians' conclusions about her ability to work.

Even if defendant's statements about plaintiff's diabetes, diabetic retinopathy and vitreous hemorrhage, back and shoulder pain, kidney disease and carpal tunnel syndrome were not accurate, any inaccuracies are insufficient to undermine the conclusion that defendant's determination was supported by the record, particularly when as discussed above, she provided no evidence that any of these conditions prevented her from working in her own occupation.  While plaintiff also contends that defendant misstated the record

24

when it wrote that her "own treating physicians opined that she is capable of working full-time," that statement was not factually inaccurate.  The doctors only wrote that plaintiff had no capacity for her "*current employment*," not that she lacked the ability to work full time altogether.  Indeed, plaintiff's doctor opined that she was capable of moderate stress, "normal" work which indicates that she was able to work full time.

As to plaintiff's physicians' opinions about her ability to work, defendant did address Dr. Simpson's (plaintiff's internist) report in its initial denial of plaintiff's claim, noting that her primary diagnosis was diabetic retinopathy and that she had difficulty picking things up from *and* getting up from the floor, as well as an inability to drive at night due to poor vision.  Likewise, defendant addressed Dr. Punt's (plaintiff's internist) medical source statement in its denial of plaintiff's first appeal.

Still, plaintiff's argument has some force as defendant does not appear -- at least not *expressly* -- to have considered:  Dr. Simpson's advising plaintiff to stop working in June 2021 or finding she had no capacity for her current employment; *or* Dr. Punt's statements that plaintiff could not concentrate for 25 percent of the day due to her symptoms, would require regular unscheduled breaks throughout the workday and was incapable of high-stress work (by concluding that she was only capable of normal-stress work).  The fact that defendant did not *squarely* address these opinions certainly cuts against granting its motion for summary judgment.  That said, the court also observed inconsistencies within these doctors' records.  For example, Dr. Simpson did not explain why she concluded that plaintiff had no capacity for her current employment after only identifying relatively minor physical restrictions *and* stating that there was inadequate information to determine the

degree of plaintiff's psychiatric impairment. *See Williams,* 509 F.3d at 323 (administrator's decision denying benefits was not arbitrary and capricious where claimant's treating physician offered unexplained conclusions that claimant could perform only low-stress jobs and could not lift anything over ten pounds).   Likewise, Dr. Punt offered no explanation for her conclusion that plaintiff would be off task for 25 percent of the day, nor for her statement that it was unknown how often plaintiff would need unscheduled breaks or how long those breaks would last.   Indeed, Dr. Punt added that plaintiff's cognitive issues *were still being evaluated*, and therefore, the form could not be fully completed, which neither supports her conclusions about how often plaintiff would be off task nor her need for unscheduled breaks.

### 3.  Alleged Violations of ERISA Claims Procedures

Finally, plaintiff contends that defendant's decision was arbitrary and capricious because it committed several procedural errors during its review of her claim.   As an initial matter, she faults defendant's untimely notice as to its initial benefit determination and benefit determination on the second appeal.   However, the record shows that defendant timely notified her that it needed an extension of time to resolve her initial claim and second appeal because it needed more information from her.   (Dkt. #12, at 8 and Dkt. #12-43, at 30.)   Indeed, 29 C.F.R. § 2560.503-1(f)(3) expressly states that the 45-day period for making an initial determination *may* be extended for up to 30 days for matters beyond the plan's control.   Similarly, 29 C.F.R. § 2560.503-1(i)(1)(i), (i)(3)(i) states the plan must make a determination on review within 45 days, but "special circumstances" may warrant a 45-day extension of time.   Under these rules, therefore, it appears that

26

defendant issued plaintiff's initial decision and the second appeal decision within the respective 30-day and 45-day extension periods.[11]

Next, plaintiff contends that it did not allow her to respond to the nurse case manager's analysis. Even assuming that defendant improperly failed to provide plaintiff with the nurse case manager's review during her first appeal, however, she did *not* show any prejudice by the omission. To the contrary, plaintiff could have responded to the nurse's report during her second appeal; the nurse's report mostly summarized her medical records, only adding that the severity of her symptoms fluctuated; and defendant did not expressly rely on the report in denying her first appeal. *See Zall v. Standard Ins. Co.*, 58 F.4th 284, 297 (7th Cir. 2023) (concluding that plaintiff was prejudiced when he "was never afforded a meaningful opportunity to respond to the report's contents while his claim was still undergoing administrative review" *and* defendant "relied on that undisclosed report to uphold its decision to terminate the long-term disability benefits" (quotation marks omitted)).

Thus, although a different decision on plaintiff's claim could have been justified on this record, this court's inquiry is more limited as a matter of law. *See Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005) ("[W]e will not set aside a denial of benefits based on any reasonable interpretation of the plan . . . . Indeed, whether or not we would have reached the same conclusion is irrelevant.") (internal citations omitted). Instead, the inquiry is whether defendant's decision was arbitrary and capricious, and the

---

[11] Although it does appear that defendant may well have untimely issued its decision on plaintiff's *first* appeal, she did not raise that as a procedural violation and the court will not further address it.

undisputed evidence shows that it was not.   Accordingly, summary judgment will be granted in defendant's favor.

ORDER

IT IS ORDERED that:

1)  Plaintiff's motion for summary judgment (dkt. # 13) is DENIED.

2)  Defendant's motion for summary judgment (dkt. #16) is GRANTED.

Entered this 24th day of January, 2024.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge